**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**DAVENPORT DIVISION**

| | | |
|---|---|---|
| SHIRLEY ANN EVANS, | * | CIVIL NO. 4:16-cv-00106-JAJ-SBJ |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | **REPORT AND** |
| NANCY A. BERRYHILL, | * | **RECOMMENDATION** |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

# TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………………..2

II. PROCEDURAL HISTORY …………………………………………….................3

III. REVIEW OF ADMINSTRATIVE RECORD ………………………………….....4

    A. Medical Records ……………………………………………………………4
    B. Functional Capacity Assessments by Consulting Agency Doctors ……………....……19
    C. Reports Completed by Shirley Evans ………………………………………………..22
    D. Hearing Testimony of Shirley Evans ……………………………………………....25
    E. Testimony of Vocational Expert …………………………………………………..28
    F. Decision of Administrative Law Judge …………………………………………….30
    G. Dr. Gilg's Fibromyalgia Residual Functional Capacity Questionnaire ………………34

IV. JUDICIAL REVIEW OF DECISION ………………………………………………36

    A. Standard of Review ……………………………………………………………….36

    B. Analysis of Evans' Arguments …………………………………………………....38

        1. New Evidence Submitted to Appeals Council ………………………………38
        2. ALJ's Residual Functional Capacity Assessment …………………………40
        3. Hypothetical Question to Vocational Expert ……………………………….46
        4. Assessment of Evans' Subjective Complaints ………………………….....48

V. RECOMMENDATION ……………………………………………………………….51

# I. INTRODUCTION

Plaintiff Shirley Ann Evans ("Evans") seeks judicial review of the Social Security Commissioner's decision denying her Application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Evans was found to suffer from the severe impairments of fibromyalgia, degenerative disc disease of the cervical spine, hand osteoarthritis, depression, anxiety, hearing loss and carpal tunnel syndrome. While it was determined that Evans is unable to perform any past relevant work, it was found that, considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform. Consequently, the Commissioner concluded Evans was not disabled for purposes of the Act.

Evans insists she is unable to engage in any substantial gainful activity due to her medical impairments and, therefore, is disabled under the Act, and entitled to benefits accordingly. She asserts four primary arguments before this Court: (1) new and material evidence from a treating source presented to the Appeals Council provides a basis for remand and/or reversal; (2) the residual functional capacity assessment is not supported by substantial evidence based on the record as a whole; (3) the administrative law judge submitted inaccurate hypothetical questions to the vocational expert; and (4) the evaluation of the credibility of her subjective complaints is erroneous. At the center of those arguments is a fibromyalgia residual functional capacity questionnaire completed by a treating physician and submitted to the Appeals Council after the decision of the administrative law judge was issued. Evans requests that this Court reverse the decision of the Commissioner and award benefits; alternatively, Evans requests the matter be remanded for further review.

This case was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for submission of a report and recommendation regarding disposition (Dkt. 18). As set forth below,

it is recommended that the decision of the Commissioner be affirmed.

## II. PROCEDURAL HISTORY

Evans applied for Social Security disability insurance benefits on October 4, 2012, with an alleged disability onset date of August 1, 2012. Administrative Record ("A.R.") 86-100. The Social Security Administration denied her application for benefits initially on July 24, 2013, and upon reconsideration on November 5, 2013. *Id.* 86-118. Based upon a timely request for a hearing, Evans' claims were heard before Administrative Law Judge ("ALJ") Tom Andrews on November 18, 2014. *Id.* 35-85, 145. Evans was represented by counsel, and testified on her own behalf. *Id.* 43-74, 83-84. Vocational expert Carma Mitchell responded to hypotheticals presented by the ALJ and Evans' counsel. *Id.* 74-82.

The ALJ issued a written decision denying Evans' application for benefits on January 8, 2015. *Id.* 19-29. Evans timely requested a review of the ALJ's decision and submitted a fibromyalgia residual functional capacity questionnaire completed by her treating rheumatologist with a date of February 18, 2015, as new and material information. *Id.* 9, 12. The Appeals Council made the completed questionnaire a part of the record but denied Evans' request for review. *Id.* 1-4. The Appeals Council noted it considered the additional evidence but found the "information does not provide a basis for changing the [ALJ's] decision," and further "found no reason under [their] rules to review" the decision. *Id.* 1-2. Consequently, the decision of the ALJ stands as the final decision of the Commissioner. *Id.*

Evans filed her Complaint (Dkt. 1) before this Court on April 11, 2016. She asserts the decision is erroneous and not supported by substantial evidence, and that her claim should be reconsidered on its merits. *Id.* ¶ 7. Evans alleges the decision was in error on several points: the failure to consider her inability to maintain a work schedule as evidenced by medical testimony; the failure to give proper weight to the medical testimony of her care providers; an improper

hypothetical was submitted to the vocational expert; the failure to find her testimony was entitled to great weight; the residual functional capacity was not supported by substantial evidence; an impermissible conclusion as to the residual functional capacity was reached based on her daily activities; and the failure to consider new and material evidence which contradicts the decision. *Id.* ¶ 6.

The Commissioner filed an answer (Dkt. 8) on June 16, 2016, with a copy of the Administrative Record (Dkt. 9). The Commissioner contends Evans has not shown "good cause" to warrant reversal or remand under the Act, 42 U.S.C. § 405(g).

Evans filed a brief (Dkt. 15) setting forth her arguments on September 14, 2016. The Commissioner submitted a responsive brief (Dkt. 17) on December 5, 2016. A hearing was held before the undersigned on June 22, 2017. The matter is considered to be fully submitted for purposes of this report and recommendation.

### III. REVIEW OF ADMINISTRATION RECORD

This Magistrate Judge has reviewed the entire Administrative Record (Dkt. 9), and summarizes certain portions as background for the specific issues presented by the parties as follows: (a) medical records, (b) functional capacity assessments by consulting agency doctors, (c) reports completed by Shirley Evans, (d) testimony of Evans at the hearing, (e) testimony of the vocational expert, (f) written decision of ALJ Andrews, and (g) the Fibromyalgia Residual Functional Capacity Questionnaire completed by Dr. Gilg.

#### A. Medical Records

Evans saw Dr. Charles Denhart on October 22, 2009, for an examination complaining of a history of right arm pain into in her right hand. A.R. 349. Dr. Denhart conducted an examination and diagnostic testing, finding Evans suffered from mild bilateral carpal tunnel syndrome, although she was only symptomatic on the right side. *Id.* 350. The right ulnar and radial nerve

conduction studies were normal, and the right upper extremity EMG needle exam was normal. *Id.*
Dr. Denhart found no evidence for denervation or for right cervical radiculopathy. *Id.*

An MRI of Evans' cervical spine was taken on January 14, 2011. A.R. 352-53. Dr. James Choi found a degenerative disc bulge and spurs at C5-6, which contributed to mild central canal and mild right greater than left neural foraminal narrowing. *Id.* 353. Dr. Choi also noted a small left paracentral disc protrusion at C6-7 mildly effacing the ventral theca sac. *Id.*

Evans saw Dr. Jeffrey Schoon on February 2, 2011, for follow-up of neck discomfort. A.R. 336-37. Evans reported having lots of pain, and that she spoke to an orthopedic surgeon who told her she needed to have surgery or to try an epidural injection. *Id.* 337. She indicated she was scheduled for an injection soon, had a loss of motion in her neck and persistent pain in her neck. *Id.* Dr. Schoon noted Evans was going back to work, and indicated the injection was a reasonable choice. *Id.*

Evans saw Dr. Schoon again on March 21, 2011, to discuss her pain medications. A.R. 346-47. She reported the pain in her neck was severe, and she had an appointment with Dr. Christian Ledet at the pain clinic to hopefully receive another cervical epidural injection. *Id.* 347. She indicated the last injection worked well, but it had worn off. *Id.* Dr. Schoon indicated if the injection did not work, or if it wore off again quickly, she would have to look at a possible surgical process. *Id.*

Evans saw Dr. Ledet the next day, March 22, 2011, for follow-up evaluation in regard to difficulty with cervical radiculopathy. A.R. 351. Dr. Ledet noted the previous epidural steroid on February 25, 2011, was of benefit, but Evans reported a return of the pain. *Id.* Dr. Ledet recommended increasing medications, and performing another cervical epidural steroid injection. *Id.* Dr. Ledet noted if Evans did not derive lasting benefit from the procedure, a return for surgical evaluation would be the next step. *Id.* Evans tolerated the procedure well. *Id.*

Evans saw Dr. Cassim Igram on April 22, 2011, for consultation concerning neck pain and symptoms in her upper extremities. A.R. 358. Evans described her pain as 9 out of 10, with an aching, burning type of pain in the neck with symptoms into the arms, especially on her right side. *Id.* On examination, Dr. Igram noted 5/5 strength in her arms with good bulk and tone of the muscles. *Id.* Dr. Igram noted in the MRI of Evans' cervical spine some mild degenerative changes, but he did not find significant spinal cord and/or nerve impingement anywhere in the study. *Id.* His impression was neck and upper extremity pain and radiographic evidence of cervical spondylosis. *Id.* Dr. Igram did not believe Evans would require surgery, injections were not worth pursuing since they gave limited benefit, and he opined a flare up of fibromyalgia could be causing the symptoms, and was worth pursuing. *Id.* He also suggested Evans going off prescribed statins to help determine whether the medication contributed to muscle aches. *Id.*

Evans returned to Dr. Schoon on April 27, 2011, for continued neck pain and right arm pain, numbness and tingling. A.R. 334-35. Dr. Schoon noted Evans had seen two orthopedic surgeons who told her she was not a surgical candidate. *Id.* 335. Evans indicated she had been taking hydrocodone but still had pain. *Id.* She said she could not live with the pain like this, which is on the right side of her neck and right arm. *Id.* She had not been going to physical therapy, and was continuing to work. *Id.* Dr. Schoon referred Evans to physical therapy, and strongly urged her to be compliant. *Id.* He also strongly urged Evans to stop smoking and referred her to the pain management clinic. *Id.*

Evans saw Dr. Delwin Quenzer on October 20, 2011, for consultation concerning hand surgery. A.R. 317. Dr. Quenzer reviewed records from September 2011 demonstrating right cubital tunnel syndrome, and noted it was a new finding since a test conducted in October 2009. *Id.* He noted Evans had a history of cervical radiculopathy, and she received right limited open carpal tunnel release in April 2010. *Id.* It was also noted Evans underwent a cervical epidural

steroid injection on October 5, 2011, which was very helpful, eliminating pain in the right arm following the injection. *Id.* Evans indicated she still has numbness and tingling, but it is only in the thumb and index finger. *Id.* On examination, Dr. Quenzer noted the neck ranges of motion are full, elbow ranges of motion are full, and sensation is a little diminished in the thumb and index finger. *Id.* It was also noted Evans had negative provocative findings for carpal tunnel syndrome, and a well healed incision from previous surgery. *Id.* Dr. Quenzer's impressions were right C6 radiculopathy improved; incidental finding of ulnar neuropathy not correlated with clinical findings and status post right open carpal tunnel release, good result. *Id.* Dr. Quenzer advised if the right arm pain recurs, Evans should call Dr. Ledet and determine whether to return to see him for pain management or look at surgical options. *Id.* 318.

Evans again returned to Dr. Schoon on December 2, 2011, for neck and back pain. A.R. 341-42. Evans indicated she and her husband were remodeling their house, and she had been helping him with lifting and carrying, but developed increasing pain in her neck and right arm. *Id.* 342. Dr. Schoon noted restricted motion in Evans' neck, secondary to pain, and she has an appointment for another possible injection in her neck. *Id.* Dr. Schoon advised Evans to not be doing the kind of manual labor, lifting and carrying she had been doing. *Id.*

On December 5, 2011, Evans returned to Dr. Ledet for evaluation of aching and numbness in her right upper extremity. A.R. 308. Dr. Ledet noted Evans was neurovascularly intact, and had 5/5 strength in hand grip, wrist flexion/extension, elbow flex on extension and shoulder girdle abduction/adduction. *Id.* Dr. Ledet recommended Evans proceed with a cervical epidural steroid application, to which she consented. *Id.* Evans tolerated the procedure well, and was to follow-up in the future. *Id.*

Evans saw Dr. Ledet again on January 10, 2012, for evaluation of difficulty with cervical radicular symptoms. A.R. 305. Evans indicated two months ago she had an epidural injection that

was a benefit, but had a return of symptoms. *Id.* Dr. Ledet recommended an epidural steroid, with follow-up. *Id.* Dr. Ledet indicated a surgical evaluation would be an option if Evans did not realize a benefit from the procedure. *Id.* Dr. Ledet performed the epidural steroid injection, and indicated Evans tolerated the procedure very well. *Id.*

Evans saw Dr. Schoon on January 18, 2012. A.R. 450. She reported symptoms of palpitations, including dizziness. *Id.* 451. She also indicated she had been having a lot of stress at work, and received a bad review recently for the first time in her life. *Id.* She reported her fibromyalgia had been a little more painful, but had no new muscle aches or pains, no vision changes, no headaches and her mood had been stable other than the recent stress. *Id.* She further reported she had an epidural injection for her neck, and "had great results." *Id.* On exam, Dr. Schoon noted her neurological exam was normal, and her gait was normal. *Id.* Dr. Schoon believed the palpitations were probably anxiety related due to Evans' recent stress. *Id.* 451-52.

Evans returned to Dr. Schoon on February 3, 2012, reporting issues with her hearing, memory problems and neck pain. A.R. 296-97. Evans reported she was having problems at work, and thought she was in danger of losing her job. *Id.* 297. She also was having memory issues, and thought it was due to medications she was taking. *Id.* She described having worse pain to the point of being intolerable, and did not believe her last epidural injection in her neck helped. *Id.* She expressed interest in seeing a surgeon, and described the pain as going into her right arm and right triceps area. *Id.* She also reported having increased problems with her hearing. *Id.* Dr. Schoon did not believe Evans' memory issues were likely caused by her medications, and advised Evans to discuss it with the prescribing pain doctor. *Id.* It was also recommended Evans schedule an appointment with a neurosurgeon to see if there were any surgical options for her neck. *Id.* Dr. Schoon also referred Evans for evaluation of her hearing, and the possibility of hearing aids. *Id.*

Evans returned to Dr. Ledet on February 6, 2012, for follow-up in regard to difficulty with

the cervical radiculopathy. A.R. 304. It was noted the medications had been causing Evans difficulty with memory loss, stumbling and balance issues at work. *Id.* Evans reported having waxing and waning patterns of pain, causing her distraction in her arm and shoulder. *Id.* Epidural steroids had been a benefit, but Evans continued waxing and waning patterns of symptomatology. *Id.* Dr. Ledet changed medications with Evans to return for reevaluation within two weeks. *Id.* Evans did so, on February 14, 2012, and described her symptoms as reasonably well treated with medication. *Id.* 302. Dr. Ledet explained to Evans he would not continue her on an opiate long term, however, during the recovery phase he believed it was reasonable. *Id.* Dr. Ledet indicated he would plan to see Evans in another six to eight weeks to review her progress with further recommendation, continuing with current medications. *Id.*

On February 15, 2012, Evans saw Dr. David Boarini for neurosurgical consultation for complaints of neck pain with radiation down her right arm. A.R. 322. Dr. Boarini noted previous therapy included cervical steroid injections which provided good relief for 30 days, last on January 10, 2012. *Id.* He further noted Evans had taken medications for her symptoms, and received physical therapy with no relief. *Id.* Dr. Boarini also noted Evans continued to work full-time doing office work. *Id.* Upon examination, Dr. Boarini found Evans had a right C6 hypesthesia, but normal strength and no long-tract signs. *Id.* 324. Dr. Boarini reviewed Evans' previous MRI, and noted spondylotic changes at C5-6, and a small defect at C6-7 but asymmetrically to the left. *Id.* Dr. Boarini believed a new MRI was necessary to be sure there had not been a change. *Id.*

Evans returned to Dr. Boarini on February 27, 2012, for follow-up after the MRI of her cervical spine. A.R. 328. Evans reported she was the same with neck pain, radiating down her right arm to her thumb and index finger. *Id.* Dr. Boarini noted Evans has taken medications for her symptoms and continues to work full-time. *Id.* Dr. Boarini found Evans' MRI scan was unchanged with minor degenerative changes at C5-6, but quite asymmetrical to the left. *Id.* 329.

Dr. Boarini was not convinced there was a compression lesion in the neck. *Id.* Dr. Boarini ordered an EMG because one conducted six months previously was not definitive. *Id.*

Evans returned to Dr. Boarini again on March 12, 2012, for a follow-up after the EMG. A.R. 325. Evans reported similar pain from her neck radiating down her right arm to her hand, thumb and index finger. *Id.* She also reported a "pulling sensation" in her neck when turning her head to the left, with right hand weakness and "dropping items." *Id.* Dr. Boarini again noted Evans has taken medications for her symptoms and continues to work full-time. *Id.* According to Dr. Boarini, the EMG showed very minimal findings in the right C7 distribution, and nothing suggestive of active compression. *Id.* 326. He further indicated Evans had very minor radiculopathy difficulties, and he was unconvinced from her MRI and exam that she needs anything done surgically. *Id.* Dr. Boarini prescribed nonsteroidal medications and physical therapy with follow-up in one month. *Id.*

Evans saw Dr. Joseph Gilg on June 4, 2012, for follow up on her fibromyalgia. A.R. 513. Upon physical examination, Dr. Gilg found Evans' gait was within normal limits, she was able to make a full fist, and no effusions or tenderness on full motion at wrists, elbows, knees and ankles, no swelling or tenderness to palpitation at joints of the feet, shoulders and hips have normal motion, moderate tenderness to palpitation of her posterior neck, upper back, lower back, lateral elbows, lateral hips and anserine bursa regions, all tender bilaterally. *Id.* 514. Dr. Gilg's assessment was fibromyalgia and arthralgia in Evans' hands, although exam did not suggest rheumatoid arthritis, and bulging disc in the lower cervical spine. *Id.* 515. Dr. Gilg discussed with Evans her disease course and therapeutic options, adjusting medications, encouraged her to exercise or walk, and directed her to return in four to six months. *Id.*

Evans saw Dr. Schoon on July 31, 2012, and reported she had a tough several months, and was demoted at work in May. A.R. 442-43. Evans expressed she felt her employer was making a

concerted effort to fire her in spite of all the years of service she had given to them. *Id.* 543. According to Evans, she had to work six months without any paid time off or missed days or she would be fired. *Id.* She indicated an increase in headaches, and her fibromyalgia had been much worse. *Id.* Among other things, Dr. Schoon noted on exam Evans' hearing was not impaired, her gait was normal, and she was able to tandem walk without difficulty. *Id.* Dr. Schoon further noted Evans was able to perform an exercise for him while wearing platform pumps. *Id.* Dr. Schoon believed many of Evans' anxieties and moods were due to her life situation with work, and he did not believe medication would take care of it. *Id.* 443-44. In Dr. Schnoon's opinion, Evans' fibromyalgia had flared up because of the dysthymia and anxiety. *Id.* 444.

Evans saw Dr. Schoon again on September 18, 2012, for follow-up. A.R. 439-40. Evans indicated she was having issues with disability at work, and still having significant issues with fibromyalgia pain and headaches. *Id.* 440. She reported she was being treated for depression and anxiety by Dr. Richards, who recommended outpatient treatment. *Id.* Dr. Schoon urged her to do so, and also suggested she see Dr. Gilg to discuss permanent disability due to fibromyalgia. *Id.* Dr. Schoon discussed with Evans working on her weight loss, and increasing her exercise. *Id.*

Evans returned to see Dr. Gilg on September 20, 2012. A.R. 510. Upon physical exam, Dr. Gilg found Evans' gait was within normal limits, moderate tenderness to palpitation involving posterior neck, upper back, lower back, lateral hips, lateral elbows and anserine bursa regions, those regions were all tender bilaterally. *Id.* 512. Dr. Gilg further noted Evans was able to make a full fist and no effusions or tenderness on full motion involving wrists, elbows, knees and ankles, no abnormality involving curvature of spine, and cervical spine has fairly normal motion. *Id.* Dr. Gilg's impressions included continued pain from fibromyalgia, bulging disc in the lower cervical spine and osteoarthritis of the hands. *Id.* The plan was to continue with monitoring and adjustment of medications, low level exercise was encouraged, and return in four to six months. *Id.*

Evans next saw Dr. Gilg on December 5, 2012, for fibromyalgia and osteoarthritis of her hands. A.R. 507. Upon physical exam, Dr. Gilg found Evans' gait was within normal limits, shoulders and hips normal motion, no tenderness on movement, no effusions or tenderness on full flexion and extension involving wrists, elbows, knees and ankles, moderate tenderness to palpitation involving upper trapezius region, posterior neck, lateral hips, lower back, lateral elbows and anserine bursa regions. *Id.* 509. Dr. Gilg noted Evans was able to make a full fist, and noted no effusions or tenderness on full flexion and extension involving wrists, elbows, knees and ankles. *Id.* Dr. Gilg's impressions were continued pain from fibromyalgia, bulging discs in lower cervical spine and osteoarthritis of hands. *Id.* The plan was to continue adjustments and monitoring of her medications, encourage low-level exercise, and return in three months.

Evans returned on January 28, 2013. A.R. 503. Upon physical exam, Dr. Gilg noted Evans' gait was within normal limits, no effusions or tenderness, full flexion and extension bilateral wrists, elbows, knees and ankles, normal motion shoulders and hips with no tenderness on movement, moderate tenderness to palpitation involving upper trapezius region, posterior neck, lateral hips, lateral elbows, lower back diffusely and anserine bursa regions with these all tender bilaterally. *Id.* 505. Evans was again able to make a full fist. *Id.* Dr. Gilg's impressions were continued pain with fibromyalgia, bulging disc in lower levels cervical spine, osteoarthritis of hands. *Id.* Evans expressed concerns about frequent falls and concentration problems. *Id.* Dr. Gilg's plan was to adjust Evans' medications, arrange for a neurology evaluation, consider possible adjustment of medications further after the evaluation, and return in three to four months. *Id.* 505-06.

Evans saw Dr. Mark Puricelli on April 3, 2013, for consultation concerning memory change. A.R. 466. Evans complained of extreme forgetfulness and intermittent confusion, which she indicated caused her to lose her job of 32 years. *Id.* She indicated she had progressive memory disturbance for at least a year, and had fallen on several occasions. *Id.* The plan was to order a

number of tests, including an MRI of the cervical spine, an EEG, an MRI of the brain, and an EMG of the bilateral lower extremities. *Id.* 468-69.  Dr. Puricelli noted follow-up would be dependent on the tests results. *Id.* 470.

Electrodiagnostic testing performed by Dr. Puricelli on April 9, 2013, indicated nerve conduction testing and electromyography of bilateral lower extremities was within normal limits. *Id.* 481-82.  Dr. Puricelli concluded electrodiagnostic testing was normal, and did not support clinical suspicions of a neuromuscular process. *Id.* 482.

An MRI of the brain was reviewed by Dr. William Young on April 19, 2013, who found Evans' has a normal brain. A.R. 470.  The MRI of the cervical spine showed mild disc degeneration present at C5-C6, which was not unusual for a person of Evans' age. *Id.* 472.  Further impressions included a very small left paracentral predominantly subligamentous disc herniation which indents the ventral thecal sac and could cause intermittent contact with the left C6 nerve root entry zone. *Id.*  However, it was noted there was no definite spinal cord compression or nerve root impingement on the static examination. *Id.*  The spinal cord was otherwise normal, and no other significant extradural defect or disease was noted. *Id.* 472-73.  At the C6-C7 level there was a shallow broad-based protrusion of the disc material noted, causing crowding of the existing pathway of the left C7 nerve root. *Id.* 473.  It was noted there was no critical stenosis, but certainly irritation of the left C7 nerve root would be possible. *Id.*  The impression was a modest two level degenerative disease of the cervical spine at the C5-C6 and C6-C7. *Id.*

Evans saw Dr. Gilg again on May 8, 2013. A.R. 499.  She reported pain in her legs at night, waking her up with intense pain, and lower back pain. *Id.*  Dr. Gilg noted the history of Evans' fibromyalgia and summarized her treatment. *Id.* 499-500.  Upon physical exam, Dr. Gilg found Evans' gait was within normal limits, she was able to make a full fist with both hands with good grip strength, mild hypertrophic changes involving PIP joints second through fifth fingers, no

effusions or tenderness full flexion and extension bilateral wrists, elbows, knees and ankles, normal motion shoulders and hips with no tenderness on movement, moderate tenderness to palpitation involving upper trapezius region, posterior neck, lower back, lateral hips, lateral elbows and anserine bursa regions. *Id.* 501. Dr. Gilg's impressions included continued pain from fibromyalgia, herniated disc at C5-6, noting some symptoms in upper extremities, and no previous improvement with steroid injections for which Evans desired a surgical consultation, osteoarthritis of the hands. *Id.* 502. Dr. Gilg adjusted Evans' medications, directed her to follow up with a neurologist, and arranged for a visit to evaluate her cervical spine issues, with return in three to four months. *Id.*

Evans saw Dr. Peter Klara on June 5, 2013, for neck pain with radiculopathy. A.R. 523. Dr. Klara noted Evans had a greater than two year history of neck pain, she occasionally had numbness and tingling in her right hand, but recently experienced that in both hands, her pain was made worse by standing and activity, and was not completely relieved by rest and medications. *Id.* Dr. Klara conducted a neurosurgical evaluation related to these issues. *Id.* 526. Dr. Klara noted Evans' neurologic motor exam was without focal motor deficit, sensory exam was suggestive of intermittent numbness and tingling, currently not experiencing, musculoskeletal exam range of motion of the cervical and lumbar spine were reasonably full, although somewhat self limited. *Id.* Dr. Klara noted a review of the MRI of Evans' cervical spine showed moderate degenerative disc disease and spondylosis at C5-6 and C6-7 that does not coincide with Evans' right side symptomatology. *Id.* Dr. Klara further noted Evans had previous EMGs of the lower extremity that were normal. *Id.* Dr. Klara's assessment was cervicalgia and spondylosis, and recommended conservative management, although if Evans' symptoms progress, consider EMGs and NCVs of both upper extremities. *Id.* Dr. Klara discussed with Evans conservative management of the neck and back pain, consideration of a drug holiday, as well as weight reduction and smoking cessation.

*Id.* In a disability questionnaire in connection with this appointment, Evans noted among other things that her pain was fairly severe at the moment, she could look after herself normally but it caused extra pain, the pain prevented her from walking more than a half mile, and it prevented her from sitting more than an hour, and she could stand as long as she wants but it gives her extra pain. *Id.* 527.

On June 27, 2013, Evans saw Dr. Jim Andrikopoulos for a neuropsychology examination. A.R. 537-38. Dr. Andrikopoulos noted Evans was reporting memory problems and falls. *Id.* Dr. Andrikopoulos found there was no cognitive impairment to suggest anything organic, Evans' memory was generally intact but naming and semantic fluency were impaired. *Id.* Personality testing results were consistent with a patient who has fibromyalgia, and there really were not any severe cognitive symptoms. *Id.* Dr. Andrikopoulos noted Evans apparently quit her job because she felt from a cognitive standpoint she could not function. *Id.* Concerning his recommendations, Dr. Andrikopoulos noted Evans was doing fine from a cognitive standpoint, she reported a great deal of semantic complaints that seem to be excessive, and in addition to medications she is on for depression she is also seeing a therapist. *Id.*

Evans returned to see Dr. Puricelli on August 15, 2013, for follow up on memory change issues. A.R. 540. It was noted Evans continued to complain of numbness and tingling in her hands, memory disturbance and falls. *Id.* Dr. Puricelli also noted Evans' usual chronic pain was treated by her rheumatologist, and neuropsychological testing revealed no dementing process, and a tendency towards somatization; Evans' MRI of her brain was normal and the EMG of her lower extremities was noncontributory; no procedure was indicated by a neurosurgeon concerning her cervical spine issues; and her EEG was normal. *Id.* Dr. Puricelli further noted that in addition to cervical degenerative disease and spondylosis, Evans had a history of bilateral carpal tunnel syndrome and right ulnar neuropathy. *Id.* 542-43. Dr. Puricelli planned to evaluate Evans with

another EMG of her upper extremities to try to differentiate the cause of her upper extremity symptoms. *Id.* 543.  Dr. Puricelli did not plan to comment on Evans' disability proceedings since he had been unable to demonstrate a primary neurological disorder. *Id.*

On August 19, 2013 Dr. Puricelli conducted electrodiagnostic testing of Evans, and noted the nerve conduction testing and electromyography were within normal limits. A.R. 544-45.  Dr. Puricelli concluded the electrodiagnostic testing was normal and did not support clinical suspicions of a neuromuscular process. *Id.* 545.

Evans returned to see Dr. Gilg on August 27, 2013. A.R. 554.  Upon physical exam, Dr. Gilg found Evans' gait was within normal limits, she was able to make a full fist with both hands, no effusions or tenderness full flexion and extension involving bilateral wrists, elbows, knees and ankles, normal motion bilateral shoulders and hips with no tenderness on movement, moderate tenderness to palpitation involving upper trapezius region, posterior neck, lower back, lateral hips, lateral elbows and anserine bursa regions. *Id.* 556.  Dr. Gilg's impressions included continued pain from fibromyalgia, some symptoms down upper extremities due to herniated disc at C5-C6, although he noted that the neurologist and neurosurgeon did not feel radicular pain was present, and osteoarthritic hands. *Id.* 557.   The plan was for evaluation by a neurologist for Evans' falls and concentration problems, to conduct a trial medication with continuation of her other medications, and encourage low level exercise. *Id.*

Evans saw Dr. Gilg again on October 24, 2013. A.R. 599.  On physical exam, Dr. Gilg found Evans' gait was within normal limits, she was able to make a full fist with both hands, no effusions or tenderness full flexion and extension bilateral elbows, wrists, knees and ankles. *Id.* 601.  Dr. Gilg noted normal motion bilateral shoulders and hips with no tenderness on movement, and moderate tenderness to palpitation involving posterior neck, upper back, lower back, lateral elbows, lateral hips and anserine bursa regions.  *Id.*   Dr. Gilg's impressions included continued

pain from fibromyalgia, although he noted partial help with the current program, symptoms down her upper extremities related to her herniated disc, although the neurologist and neurosurgeon did not feel radicular pain was present, and osteoarthritis in her hands with some continued pain involving finger joints, although the current medication was partially helpful. *Id.* 602. The plan was to adjust certain medications, continue with others, encourage low level exercise and return in three to four months. *Id.*

Dr. Gilg saw Evans again on February 4, 2014, and, upon physical exam, again noted Evans' gait was within normal limits, she was able to make a full fist with both hands, no effusions or tenderness full flexion and extension bilateral elbows, wrists, knees and ankles. A.R. 595, 597. Dr. Gilg noted normal motion bilateral shoulders and hips with no tenderness on any movement, and moderate tenderness to palpitation diffusely posterior neck, upper trapezius region, anterior chest, lateral elbows, lateral hips and anserine bursa regions. *Id.* Dr. Gilg's impressions included continued pain from fibromyalgia, although he noted partial help with the current program, symptoms down Evans' upper extremities related to her herniated disc, although the neurologist and neurosurgeon did not feel radicular pain was present, and osteoarthritis in her hands with some continued pain involving finger joints, although the current medication was partially helpful. *Id.* 598. The plan was to continue with the current medications, encourage low level exercise and to return in three to four months. *Id.*

Evans again saw Dr. Gilg on June 3, 2014. A.R. 590. Dr. Gilg provided a thorough summary of Evans' treatment history:

> I originally evaluated her in 2005. I had seen her again in May of 2011 after not seeing her for over 2 years. When I saw her June 4, 2012, I had not seen her dating back to June of 2011. Nortriptyline had been increased to 75 mg at bedtime 2011. Nortriptyline was started in 2006. Cymbalta was started originally in 2006 for irritable bowel syndrome, although changed by Dr. Schoon in spring of 2012 to venlafaxine XR 150 mg daily because of insurance reasons. She had been taking gabapentin 600 mg in the morning and evening with 300 mg in the afternoon until that was stopped when she saw Dr. Boarini for another surgical opinion in the

spring of 2012.  On June 4, 2012, I started back gabapentin, although using 600 mg b.i.d. as the dosage in the afternoon was making her a bit tired.  However, she had stopped gabapentin later in June 2012 when she found that she had coordination problems and dizziness, improving after stopping the medicine after discussing situation, she was not convinced that the medication caused her problems completely and she started back gabapentin low dose 300 mg b.i.d. on August 27, 2013.  Surgeon had given her sulindac although she has stopped that when she was not sure was helpful.  I had given meloxicam 15 mg daily December 5, 2012 to see if this will help her finger symptoms.  Tramadol has been continued 100 mg b.i.d. on most days over several years, with prescription again given by me starting in June of 2012.  Before stopped, gabapentin had been used regularly dating back to May of 2011.  Dr. Boarini did not recommend further injections or operations on the spine.  MRI scan of cervical spine in January 2011 showed degenerative disc bulge at C5-6 with spurs and small disc protrusion at C6-7, although no significant nerve root compression.  Dr. Hatfield had seen her in 2011, not recommending operation.  Dr. Ledet did perform a cervical epidural steroid injections on 2 occasions in early 2011, although not helping symptoms.  Knee x-ray was normal in 2009.  When I had seen her January 28, 2013, she did continue to have the aching pain involving her upper back, neck, lower back, and lateral hips and also was concerned that she was having frequent falls, finding it difficult to pick up her foot at times and having difficulty concentrating with some mental status changes.  She had been sent for neurology consultation with Dr. Puricelli April 3, 2013 with laboratory at that time including normal results for thyroid test, creatinine, ALT, AST, and vitamin B12.  MRI scan of cervical spine April 9, 2013 showed modest degenerative changes at C5-6 and C6-7, shallow disc herniation on the left at C5-6 and broad shallow disc protrusion on the left side at C6-7.  MRI scan of the brain on April 19th, 2013 was reported normal with EMG study of lower extremities normal and EEG normal.  When I had seen her May 2013, she complained of frequent pain going down her right upper extremity with numbness and tingling involving her thumb, index finger and long finger of the right hand.  I arranged for her to get another neurosurgery opinion by Dr. Klara, who did not feel there was indication for operation and suggested conservative measures.  Dr. Puricelli had seen her in neurology followup August 15, 2013, with report of repeat EMG study bilateral upper extremities unremarkable as well as normal nerve conduction studies of the upper extremities.  Current program partially helpful although chronic aching pain continues involving posterior neck, upper back, lower back, and lateral hips.  She had a fall in April 2014 and hit her left knee, more left knee pain after that.  She had been seen at urgent care May 24, 2014 with radiologist reporting left knee x-ray showed mild medial compartment joint loss and trace effusion.  With longer standing or walking, some left knee pain can occur although also sometimes at rest with no definite swelling present.  She continues tramadol 100 mg b.i.d. on most days.  I cautiously prescribed gabapentin again 300 mg b.i.d. August 27, 2013 and she tolerates this without tiredness, dizziness, or nausea and we are going to increased gabapentin to 300 mg in the morning and 600 mg in the evening today on June 3, 2014, going back a lower dosage if not tolerated.  She continues nortriptyline 75 mg at bedtime, helping her sleep, Zolpidem used on occasion is having a hard time falling asleep, not most nights.  She tries to use her CPAP machine on a regular basis, diagnosed with sleep apnea 2011.  In May 2013, I

replaced p.r.n. use of cyclobenzaprine with tizanidine which she has been usually taking 4 mg in the evening and frequently in the morning partially helpful. I added meloxicam December 2012, replaced by etodolac 400 mg b.i.d. January 2013. With continued discomfort in her finger joints, I replaced etodolac with nabumetone 1500 mg daily October 24, 2013. Medication partially helpful although discomfort will occur in bowling now fingers with use of the hands like squeezing although good functional use of the hands and his medicines he needed help a bit better. She still has some discomfort on her feet with a lot of standing or walking, unremarkable examination. She has no abdominal pain, heartburn, or edema. She has no bleeding problems, having history of thrombocytopenia, evaluated by hematologist and platelet counts every 6 months, running between 60,000-100,000 for several years, not requiring treatment. Laboratory October 24, 2013 demonstrated platelets 72,000, hemoglobin 14.4, white blood cell count 5800, and creatinine 0.9. She has been followed for anxiety by Dr. Richards as a psychiatrist, having changed venlafaxine back to Cymbalta September 2012. Cymbalta was changed to sertraline December 2012 because of financial reasons. She takes Seroquel at bedtime. She does take clonazepam from a psychiatrist and zolpidem at bedtime as needed for insomnia, helping her fall asleep. She has not been employed since her last working August 1, 2012, not feeling she would be successful in returning to employment because of pain and anxiety.

*Id.* 590-91. Upon physical exam, Dr. Gilg found Evans' gait was within normal limits, she was able to make a full fist with both hands, no effusions or tenderness full flexion and extension involving bilateral wrists, elbows, knees and ankles. *Id.* 593. Dr. Gilg further noted normal motion on shoulders and hips with no tenderness on movement, tenderness to palpitation present diffusely involving upper trapezius region, interior chest, posterior neck, lateral elbows, lateral hips and anserine bursa regions. *Id.* Dr. Gilg's impressions included continued pain from fibromyalgia, with partial help from current program, some symptoms down upper extremities from herniated disc, and no previous improvement from injections, with the neurologist and neurosurgeon not feeling radicular pain was present. *Id.* 594. Current medication was partially helpful with osteoarthritis in her hands, although she had some continued pain in her finger joints. *Id.* The plan was to continue with the current medications, and increasing others, encourage low level exercise, and return in five or six months. *Id.*

### B. Functional Capacity Assessments by Consulting Agency Doctors

Dr. Dennis Weis completed a physical residual functional capacity assessment on July 22,

2013. A.R. 93-96.   In the opinion of Dr. Weis, Evans has exertional limitations, including occasionally lifting 20 pounds, frequently lifting 10 pounds, standing 6 hours in an 8-hour work day, sitting 6 hours in an 8-hour work day, but unlimited push and/or pull other than for lift and carry. *Id.* 93.   Dr. Weis also assessed Evans with postural limitations, including occasionally climbing ramps or stairs, never climbing ladders, ropes, scaffolds, occasionally balancing, occasionally stooping, occasionally kneeling, occasionally crouching and occasionally crawling. *Id.* 94.  Dr. Weis also assessed Evans with manipulative limitations, including limited handling and fingering with both hands, but unlimited reaching in any direction and feeling. *Id.* 94.  Finally, Dr. Weis assessed Evans with environmental limitations, including avoiding concentrated exposure to extreme cold, but unlimited extreme heat, wetness, humidity, noise, vibration, fumes, odors, dust, gases and hazards. *Id.* 95.

Beverly Westra, Ph.D. performed a mental residual functional capacity assessment on July 23, 2013. A.R. 96-98.   Dr. Westra assessed Evans with moderate limitations in the ability to understand and remember detailed instructions, moderate limitations in the ability to carry out detailed instructions, moderate limitations in the ability to maintain attention and concentration for extended periods, moderate limitations in the ability to complete a normal workday and workweek without interruptions, and moderate limitations in the ability to respond appropriately to changes in the work setting. *Id.* 96-97.   Otherwise, Dr. Westra found no significant limitations in other areas. *Id.*  These assessments led to an agency determination that Evans was not disabled for the following reasons:

> You said you are unable to work due to memory problems, fibromyalgia, hearing loss, anxiety, panic attacks, concentration problems, neck pain, not being able to sit longer than 15 minutes and hand arthritis. Records in file show that you have been treated for these conditions. Recent exams show that you have hearing within normal limits. You can communicate with others on a regular basis. You have good use of your back, arms and legs and are able to stand and walk without an assistive device. Your mental condition has been stable with treatment. You are able to care for your own personal needs, perform light household chores, run errands as needed

and prepare quick meals. We realize that you are unable to perform work that requires long periods of concentration, complex tasks and heavy lifting, such as your past work as a rating supervisor or technical support analyst. However, considering your age, education, work experience and overall condition, you are still able to perform a wide variety of work that is not strenuous and that is simple and repetitive in nature.

*Id.* 100.

On reconsideration, Evans indicated that since April 2013 she had problems with memory loss, the arthritis in her spine had worsened and her neck was hurting more, the problems in her right hand had worsened, and the pain and fatigue from her fibromyalgia had worsened. *Id.* 103. An additional mental residual functional capacity assessment was completed on August 27, 2013, by Scott Shafer, Ph.D. *Id.* 113-16. Dr. Shafer concluded the initial mental assessment remained appropriate, and was affirmed as written. *Id.* 116. An additional physical residual functional capacity assessment was also completed, by Dr. Renee Staudacher, on November 5, 2013. *Id.* 110-13. Dr. Staudacher noted no changes in the limitations previously determined by Dr. Weis, except Evans had an additional environmental limitation with respect to avoiding concentrated exposure to noise. *Id.* 112. The agency again determined Evans was not disabled, and she was informed as follows:

You asked us to take another look at the disability claim. You said that you are unable to work due to memory problems, fibromyalgia, hearing loss, anxiety, panic attacks, concentration problems, neck pain, not being able to sit longer than 15 minutes and hand arthritis. Evidence shows that you have had treatment for your impairments. Although you have some hearing loss, you are able to communicate with others on a regular basis. You have good use of your back, arms and legs and are able to stand and walk without assistive device. Your mental condition has been stable with treatment. Evidence shows that you may have problems remembering detailed tasks, however you are able to complete simple tasks. You are able to care for your own personal needs, perform light household chores, run errands as needed and prepare quick meals. We realize that you are unable to perform work that requires long periods of concentration, complex tasks and heavy lifting, such as your past work as a rating supervisor or technical support analyst. However, considering your age, education, work experience and overall condition, you are still able to perform a wide variety of work that is not strenuous and that is simple and repetitive in nature.

*Id.* 118.

### C. Reports Completed by Shirley Evans

Evans completed a personal pain fatigue report dated May 14, 2013. A.R. 210-12.  Evans described her pain to include a dull ache in the lower back of her head, sharp pain in her neck, arm pain and numbness in her hand, thumb and finger, lower back aching, sharp pains in her hip joints, dull pain in her knees going downstairs, and sharp pains in her legs radiating down the sides. *Id.* 210.  The pain is worse if she sits too long, endures cold weather, not resting or not taking her medications soon enough to control her pain levels. *Id.*  She experiences this seven days a week, and the pain lasts all day. *Id.*  Evans indicated she takes medications to keep the pain under control, but something always hurts. *Id.*  The pain is severe in the morning and worse in the evening as she is "totally worn out." *Id.*

Evans indicated she had regular visits with Dr. Gilg, trying different medications and testing. *Id.*  She takes hot baths, walks and lays down to take the edge off of her pain. *Id.* 211.  The pain limits her ability to sit for long periods of time, she cannot spend a lot of time shopping, and must limit stress and anxiety situations. *Id.*  She no longer goes shopping any more and prefers to stay home than to go out. *Id.*  Evans indicated that she is limited in the use of her hands by pain from osteoarthritis, she has been tripping and losing her balance, and some days she cannot take a shower because it hurts to feel the water hitting her skin. *Id.* 212.  She does light cleaning, laundry, walking, some yard work such as pulling weeds, but does not drive most days because she has blurry vision. *Id.*  She will get some exercise on a stationary bike. *Id.*

Evans also completed a function report dated May 14, 2013. A.R. 213-23.  She described her job as requiring her to sit at a desk on the computer all day, and when she gets up after 30 minutes, her body is in pain in her neck, elbows, wrists, hips, lower back, legs and her ankles are stiff. *Id.* 213.  She has to stand for 5 minutes before she can take a step, and is dizzy and

lightheaded. *Id.* She further indicated she had been having memory problems for a year, and it started affecting her duties as she was demoted and put on probation. *Id.*

Evans indicated she walks her pets, feeds them and waters them. *Id.* 214. With respect to personal care, the only thing affected by her conditions is she cannot blow dry her hair without pain and numbness in her arm. *Id.* 214. She does not need any reminders to take care of her personal needs and grooming, or to take medicine. *Id.* 215. Evans prepares her own meals, including a protein shake in the morning and sometimes complete meals on good days. *Id.* Concerning house and yard work, Evans described it as hit and miss with pain levels and on good days she can do a lot. *Id.* She goes outside one to two times a week in the car, and when she goes out, she walks, drives a car and rides in a car. *Id.* 216. Driving depends on the day due to her blurry vision. *Id.*

Evans shops one to two times a week for a couple of hours at a time, including for groceries in the store, or purchasing things on the computer. *Id.* 216. She can pay bills, count change, handle a savings account, and use a checkbook. *Id.* Her hobbies and interests include reading, watching TV, walking around, stretching her muscles and joints, and going to her grandson's ball games. *Id.* 217. She does these things every day, and does them "very well" if she has relief from stretching and does not have pain. *Id.* She indicated she use to grocery shop for the week, but now she goes for the day when she can, and she reads more and stretches more. *Id.* According to Evans, she does not spend time with others, and one to two times a week will go to a game for her grandson depending upon her pain level. *Id.* She prefers to stay home, but will make herself go out if her "husband acts disappointed." *Id.* 218. Evans checked the following activities as being affected by her condition: lifting, squatting, bending, reaching, sitting, kneeling, hearing, seeing, memory, completing tasks, concentration and using hands. *Id.* She did not check the boxes for standing, walking, talking, stair climbing, understanding and following instructions, and getting

along with others. *Id.*

Evans completed another function report dated August 19, 2013. A.R. 240-47. She indicated her conditions cause her to have lay in bed and stretch her muscles and joints in order to be able to walk. *Id.* 240. She is dizzy and falls when she gets up too quickly, and her fingers ache. *Id.* She has good days, but most are painful, and her medicine makes her tired and groggy. *Id.* She gets up at 9:00 a.m. on good days, makes coffee and sits in a recliner. *Id.* 241. Sometimes she eats and watches TV, lays down and tries exercises. *Id.* She takes care of all of her personal care needs except she cannot hold a blow dryer above her head. *Id.* She prepares her own meals, usually one-dish meals on a weekly basis if she has low pain. *Id.* However, she cannot stand long, and does not cook more involved meals. *Id.* She does laundry, dusting and washes a small amount of dishes one to two times a week for a few hours. *Id.* She needs help carrying laundry from the washer to the dryer. *Id.* She goes outside only if she must as she does not like the stress of getting ready, and wears down quickly. *Id.* 243. She can go out alone, and she does drive. *Id.* She shops for groceries as needed once a week for an hour. *Id.* She is able to handle all of her money needs. *Id.* For hobbies and interests, she watches TV, reads the newspaper or magazines, and goes camping with her husband on good days. *Id.* 244. She spends time on Facebook, and on good days takes her grandsons to a park. *Id.*

Evans marked the following items as being affected by her conditions: squatting, reaching, walking, sitting, hearing, memory, completing tasks, completing concentration, and using hands. *Id.* 245. The following items were not checked: lifting, bending, standing, kneeling, talking, stair climbing, seeing, understanding, following instructions and getting along with others. *Id.* In explanation, Evans indicated she has joint pain in her knees, neck and hips, and her hearing loss affects her memory and concentration. *Id.* She can complete tasks, but it takes longer than it used to, and she has osteoarthritis in her hands. *Id.* She can walk for about an hour before needing to

stop and rest, and needs about five minutes to rest before resuming. *Id.*

Evans also completed another pain questionnaire dated August 19, 2013. A.R. 248-50. She described her pain as a dull ache in her neck, shoulder, elbow, wrists, hips, knees and ankles. *Id.* 248. Her hands are achy, her fingers have sharp pain, and her chest sometimes has a sharp stabbing pain. *Id.* If she sits or stands too long, her lower back aches, and the pain is affected by changes in temperature. *Id.* Her fingers ache when she writes too much, and will get swollen. *Id.* She has pain daily, and estimates pain and fatigue four days out of a week. *Id.* The pain lasts all day, and sometimes medications can help manage, although that is rare. *Id.* Her memory is not as good, and her hearing is getting worse, as well as her balance. *Id.* Hot baths help her to relax, and walking helps her to stay loose. *Id.* 249. She cannot get up very fast, and cannot sit long. *Id.* As described by Evans, she spends a lot of time in treatment to relieve the pain, and is sometimes too tired or in too much pain to get dressed. *Id.* 250. Her activities on a typical day include stretching in the morning, possibly some laundry, picking up the house and driving to the store for a few things. *Id.* She also tries to ride a stationary bike for 20 minutes. *Id.*

### D. Hearing Testimony of Shirley Evans

Evans presented testimony to the ALJ on November 18, 2014. A.R. 43-74, 83-85. At that time, she lived in a house with her spouse, with no young children. *Id.* 43-44. She has a driver's license and has completed a high school education. *Id.* 44. She has not worked since August 1, 2012, when she took FMLA leave from her employment. *Id.* 45. Evans indicated circumstances came to the point where she could not get her desk situated in a way to make her feel comfortable, and she suffered from pain the entire day. *Id.* Once her leave expired, she informed her employer she was not able to come back to work, and resigned. *Id.* 46. She did not file for unemployment, but received short term disability payments while on FMLA leave. *Id.*

Evans testified she has shooting pains in the right side of her neck, which produces

numbing and tingling in her arm, thumb and first two fingers. *Id.* 47.  She is careful to hold her neck in certain positions to avoid the pain. *Id.*  She received treatment for her neck pain and symptoms in the form of steroid or cortisone shots in her neck. *Id.* 48.  This would reduce the swelling of the bulging discs in her neck for a month or so, but she would have to go back for additional shots. *Id.*  She also tried physical therapy for her neck, but it did not provide long term relief past the day of treatment. *Id.*  She cannot sit for long periods of time due to the pain, and usually has to get up and walk around every 15 to 20 minutes to stretch out. *Id.* 49.

Evans worked for her employer for 32 years. *Id.* 50.  She informed her supervisor she was experiencing a lot of pain in her shoulders radiating down her arm while sitting at her desk, working the calculator and typing. *Id.*  Her employer tried to address it by having the ergonomics of her desk evaluated. *Id.*  Evans received a new computer mouse, but it did not alleviate her pain. *Id.*  Her employer attempted to address the issue again because Evans was still in pain and continually holding her neck, shaking her hands and getting up and walking around to alleviate the pain. *Id.* 50-51.  She would usually get up every 15 to 20 minutes and move around because the pain would radiate from her neck into her arm, to the point she "was almost crying." *Id.* 51.

Evans further testified she has trouble gripping or holding on to things because she does not have as much strength in her hands as she used to. *Id.*  She indicated she has bilateral carpal tunnel syndrome in her hands, and had surgery performed on her right hand in 2010. *Id.* 52-53.  She still has symptoms in her left hand, and experiences numbing and tingling in her right hand, although she believes it is related to her elbow. *Id.* 53.  According to Evans, she would not be able to handwrite a two-page letter without taking a break because she would get cramps in her hand and her fingers would go numb. *Id.* 54.  Typing an email would also cause pain in her neck and lead to numbing and tingling in her arm and fingers. *Id.*

Evans also testified she experiences pain in both hips. *Id.* 54-55.  She has received one or

two shots to address the pain and physical therapy was mentioned but has not been ordered. *Id.* 55. She described her symptoms as a "really sharp shooting pain" that wakes her up at night, and occurs if she sits too long. *Id.* Walking increases pain in her hips, and there are some exercises she cannot perform because it causes pain. *Id.* 55-56. She has problems with falling and had testing done to determine the cause. *Id.* 56. According to Evans, her right foot drags but doctors have been unable to determine the reason. *Id.* 57-58.

Evans also discussed her fibromyalgia diagnosed by Dr. Gilg. *Id.* 59. She indicated it has gotten worse over the past years and affects many of her joints, including her shoulders, lower back, hips, knees, and back of her head. *Id.* 60. She has been prescribed medications, as well as some exercises, but stated "nothing really helps." *Id.* She described the pain as "burning muscle" that is dull and achy, although sometimes it is sharp. *Id.* 60-61. The pain is worse if she sits too long, lifts too much weight, or sits on the floor. *Id.* 61. According to Evans, she has to get up and move around about every 15 to 20 minutes, and would not be able to be in a car ride for an hour without stopping and stretching. *Id.* Standing up and moving relieves the immediate pain but if she sits for too long the pain comes back even worse. *Id.* 61-62. Evans indicated she can only lift a gallon of milk, but not repeatedly, and can only stand in one spot for about 10 to 15 minutes without a need to change positions. *Id.* 62.

Evans also discussed the osteoarthritis in her hands for which she receives treatment from Dr. Gilg. *Id.* 62-63. She described the arthritis as being throughout her hands, and she notices more swelling and soreness in the joints. *Id.* 63. She has only tried medication to treat the osteoarthritis. *Id.*

Evans also testified about her mental health issues including depression and anxiety for which she sees a psychiatrist, Dr. Richards. *Id.* 63-64. The medication she takes for depression and anxiety makes her sleepy and she has to lie down and take a rest "pretty much every day." *Id.*

65. She has a hard time keeping track of activities and staying focused. *Id.* 66. She has to write things down and believes her mind is not as sharp. *Id.*

As for daily activities, Evans indicated she can clean a small amount of dishes, do the laundry, lift a full basket of laundry and carry it to the living room. *Id.* 68. She does not do grocery shopping "for the most part" as her husband does so. *Id.* 69. She does not mow the yard or other yard work but can cook light meals like a casserole or place a pot full of water on the stove to boil spaghetti. *Id.* 69-70. She described exercise as "good" and indicated she can walk until she feels pain in her fingers or notices her foot dragging. *Id.* 74. She can walk around the block, but stated that is as far as she can go. *Id.*

### E. Testimony of Vocational Expert

A vocational expert ("VE"), Carma Mitchell, also testified at the hearing on November 18, 2014. A.R. 74-82. The ALJ presented an initial hypothetical for an individual of Evans' age, education and work experience, who is able on a sustained basis to engage in light activity as defined by the regulations, and have a position where they are not required to climb ladders, ropes, poles or scaffolds; need no more than occasionally climb ramps or stairs, stoop, kneel, crouch, crawl or balance; and handle or finger on a bilateral basis no more than frequently. *Id.* 75-76. In addition, the position should not constantly require rotation or flexing of the neck, and have no more than occasional exposure to extremes of cold, and no exposure to loud noise. *Id.* 76. Further, the position would be generally viewed as an unskilled level, with an SVP level 1 or 2, no more than a regular pace, and no more than occasional changes in work setting. *Id.* The position would not be an assembly-type job or production line work. *Id.*

The VE testified that such an individual would not be able to perform Evans' past work. *Id.* 76-77. The VE further testified that within that hypothetical, there would be no skills that would transfer. *Id.* 77. However, the VE testified there would be other jobs in the national

economy appropriate for such a hypothetical individual. *Id.* These would include unskilled jobs such as unskilled mail clerk, office helper and photocopy machine operator. *Id.* 77-78.

The ALJ modified the hypothetical to include that the individual should have a position where they can sit or stand at their work area or in their work zone essentially on an as desired basis. *Id.* 78. The ALJ indicated the sitting or standing would not require the individual to be off task, and they could remain at their work place, but be able to sit or stand at least typically every half hour, and perhaps more frequently. *Id.* The VE testified that if the hypothetical individual could sustain half an hour of work, switch positions, and continue working, then that person could do the jobs previously identified. *Id.* 79. However, if the individual needed to stand more frequently than every half an hour, they would not be able to perform those three jobs or any other jobs in the national economy. *Id.*

The ALJ posed a third hypothetical, building solely on the first hypothetical. *Id.* The ALJ asked the VE to assume handling and fingering on a bilateral basis moves from frequent to occasional. *Id.* The VE testified that there would be jobs available, such as a counter clerk in the light unskilled category. *Id.* 80. There also would be in the sedentary job category a callout operator and surveillance systems monitor. *Id.*

The ALJ then posed a fourth hypothetical to the VE. *Id.* 81. Building on the third hypothetical, the ALJ inquired of the VE if the individual needed to change positions on average every half an hour, but remained on point and on task, would any of the jobs remain available. *Id.* The VE testified the counter clerk job would be precluded, but the surveillance systems monitor and callout operator would remain available. *Id.*

Evans' attorney presented the VE with additional modifications to the first hypothetical. *Id.* 81-82. It was inquired whether any jobs remain available if the individual needs to take, in addition to regularly scheduled work breaks, two additional 15-minute work breaks in the morning

and two additional 15-minute work breaks in the afternoon. *Id.* 82. The VE responded no, she did not feel those breaks would be tolerated. *Id.*

## F. Decision of Administrative Law Judge

A written decision was issued by ALJ Tom Andrews on January 8, 2015, concluding Evans was not disabled under the Social Security Act from August 1, 2012, through the date of the decision. A.R. 19-29. In doing so, ALJ Andrews set forth and followed the five-step sequential evaluation process established by the Administration for determining whether an individual is disabled. *Id.*[1] It was first found Evans meets the insured status requirements of the Act through December 31, 2017, and has not engaged in substantial gainful activity since August 1, 2012, the alleged onset date. *Id.* 21. Second, ALJ Andrews found Evans has the following severe impairments: fibromyalgia, degenerative disc disease of the cervical spine, hand osteoarthritis, depression, anxiety, hearing loss, and carpal tunnel syndrome. *Id.* The ALJ considered but did not find severe Evans' history of breast cancer. *Id.* At step three, it was determined Evans does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the regulations. *Id.* 21-23. Those first three steps are not at issue for this judicial review.

At step four, which is at issue, ALJ Andrews determined the residual functional capacity of Evans as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she may not climb ladders, ropes, poles, or scaffolds. In addition, the claimant may only occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance. She may handle and finger no more than frequently,

---

[1] *See* 20 C.F.R. § 404.1520; *Cuthrell v. Astrue*, 702 F.3d 1114, 1116-17 (8th Cir. 2013); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Jimmerson v. Astrue*, 717 F.Supp.2d 840, 856 (S.D. Iowa 2010).

and she cannot have a requirement for constant rotating or flexing of her neck-as required in assembly work. Moreover, the claimant may have no more than occasional exposure to extremes of cold, as well as no exposure to loud noises and vibrations. Finally, the claimant is limited to tasks consistent with a specific vocational preparation (SVP) level of one (1) or (2), a regular pace, no assembly work, and no more than occasional changes in the work setting.

*Id.* 23-27. This determination is based upon an apparent thorough consideration and analysis of the entire record. *Id.* The ALJ first noted Evans' subjective descriptions of her symptoms and limitations associated with her various physical and mental impairments. *Id.* 23-24. It was found that Evans' impairments could reasonably be expected to cause the alleged symptoms but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* 24. The ALJ assessed objective medical evidence in the record and Evans' own statements as to her daily activities and abilities, and found inconsistencies with her asserted limitations:

Despite the claimant's allegations, after consideration of these factors, the undersigned finds the claimant likely retains the ability to perform work as described in the above-listed residual functional capacity assessment. Specifically, her admissions in her function reports, activities of daily living, physical and mental examination results, and the circumstances surrounding her departure from her last job suggest she can perform light, unskilled work, with additional postural, environmental, and manipulative accommodations.

First, however, the undersigned considered the claimant's history of breast cancer. . . . Given the fact that less than 12 months has passed since the diagnosis of the claimant's breast cancer, as well as the indication in her treatment records that no metastasis occurred, the undersigned finds the condition fails to meet the durational requirement of a severe impairment.

Next, the undersigned considered the claimant's hearing loss. At hearing, the claimant referenced the fact that she wears a hearing aid to compensate for hearing loss, but the undersigned found no record of active treatment for the condition. In fact, although assessment of her hearing during physical examination revealed the claimant could not hear finger rub bilaterally, the undersigned found no indication the claimant experiences difficulties in speech recognition or discrimination (Exhibit 6F, page 4). As such, the undersigned finds that the environmental accommodation of no loud noises fully accounts for the extent of difficulty the claimant would experience secondary to her hearing loss.

The claimant's records show that her other physical impairments have imposed

more significant symptoms for at least a year during the relevant period. Nevertheless, the undersigned finds several indications that the claimant retains the ability to perform light work despite these conditions particularly her degenerative disc disease and fibromyalgia. First, the claimant has carried her diagnoses for fibromyalgia and cervical radiculopathy since well before the alleged onset date, yet continued to work at levels consistent with substantial gainful activity. The undersigned found reference to the claimant receiving treatment for cervical radicular symptoms as early as October 2011, as well as established treatment for fibromyalgia in a record dating to April 2011 (Exhibits 2F, page 14; and 3F, page 40). Earnings records show that the claimant earned over $52,000 in 2011, though, and over $32,000 before she ceased working in 2012 (Exhibit 4D, page 1). This suggests that the claimant's symptoms associated with her degenerative described as having light to medium exertional requirements (Exhibit SE, pages 1-4).

Admittedly, symptoms can exacerbate over time and impose greater restrictions; however, the weight of the evidence does not indicate such a circumstance in this case. The claimant maintains that her symptoms worsened to the extent that she could no longer perform the job she worked for 32 years, and her employer even tried to move her to a desk job to accommodate her complaints, but to no avail (Hearing Record at 8:44:22). However, this contention is inconsistent with both the claimant's function report and her account to her physician shortly before the alleged onset date. According to a July 2012 record by her primary care provider, the claimant had been demoted at work, and she felt her employer was making a concerted effort to fire her (Exhibit 5F, page 43). This does not sound like a business trying to accommodate their employee. Moreover, if the claimant was having trouble sitting for prolonged periods, it would not make sense to accommodate her by moving her to a desk job from one that was more active. Indeed, the claimant even admitted in her function report that she experienced no troubles with standing or walking-a fact that, even considered alone, undermines her overall contention of disability (Exhibit 4E, page 6).

The consistently good results of the claimant's physical examinations further suggest she could perform light work despite her fibromyalgia and degenerative disc disease. Throughout the relevant period, the undersigned found reference to normal gait and station, full motor strength, and normal coordination and reflexes, as well as observations of good range of motion in many joints (Exhibits 6F, page 4; 8F, page 17; 12F, page 4; and 17F, pages 4, 8 & 12). These results also suggest the claimant's hand osteoarthritis and carpal tunnel syndrome would allow for frequent handling and fingering, as some of the referenced observations included the absence of swelling or tenderness in the finger joints, the ability to make full fists, and full flexion and extension in the wrists and elbows (Exhibit 17F, page 4, 8 & 12). Indeed, February 2012 electromyography (EMG) and nerve conduction testing, while noting results consistent with bilateral carpal tunnel syndrome, characterized that condition as "mild." Moreover, these results specifically ruled out evidence of cervical radiculopathy, which suggests the claimant's degenerative disc disease is not as severe as alleged (Exhibits 3F, page 31; and 17F, page 2). In fact, although magnetic resonance imaging (MRI) scans of the claimant's cervical spine indicated modest degeneration at her C5-6 and C6-7 levels, they failed to

show conclusively nerve root irritation or compression (Exhibit 6F, page 9).

Overall, the claimant's complaints of widespread pain and upper extremity dysfunction limiting her ability to stand, walk, lift, carry, handle, and finger are undermined by her admissions in her function report and to her treating source, the consistent observations of good physical abilities throughout the relevant period, and the absence of clinical correlation with objective test results. Instead, her activities of daily living suggest she can perform light work as described in the above-listed residual functional capacity assessment-especially if given additional accommodation for no constant neck flexion or rotation, as well as no more than occasional postural changes.

According to her function report, the claimant performs several daily tasks that one would associate with an ability to perform light work. These include preparing meals, shopping in stores, driving or walking for transportation, paying bills, counting change, and reading for leisure (Exhibit 4E, pages 2-5). While such activities might not denote an absence of any limitations, they do suggest the claimant can remain on her feet throughout most of the day while performing work-particularly if that work involves only simple, repetitive tasks.

As previously noted, the claimant also complains of difficulty focusing and remembering- symptoms she associates with her fibromyalgia. She also contends that her psychological impairments-depression and anxiety-cause crying spells and fatigue. Despite these claims, though, the undersigned never found indication that the claimant's memory and concentration would be so limited as to preclude unskilled work. In fact, the claimant's mental status examinations consistently indicated alertness and appropriate orientation, with persevered recent and remote memory, as well as good attention and concentration (Exhibits 6F, page 4; 12F, page 4). Moreover, neuropsychological examination by Jim Andrikopoulos, Ph.D., indicated that that the claimant's memory is generally intact. Moreover, he reported that the claimant's test results suggest an "over reporting of symptoms" and "a great deal of somatic complaints that seem to be excessive" (Exhibit 11F, page 2). Such results not only suggest the claimant exaggerates the extent of limitation imposed by her psychological symptoms, but they also those relating to her fibromyalgia and other physical impairments. Instead, the undersigned finds the previously listed activities of daily living included tasks that suggested no more than mild limitations in social functioning, as well as no more than moderate restriction with regard to concentration, persistence, or pace.

For example, the claimant ventures from her home regularly to shop for groceries and go on walks. Moreover, she maintains a relationship with her husband, uses her computer, and attends her grandson's ballgames (Exhibit 4E, pages 4-5). Such abilities suggest the claimant has little or no difficulty getting along with others. Hence, the undersigned finds her no more than mildly limited in social functioning. In addition, the claimant's abilities to drive, count change, read for leisure, and pay bills show that she can remember, understand, and perform the two and three-step tasks associated with unskilled work-despite her memory and concentration complaints. As such, the undersigned finds her no more than moderately limited in

that regard.

* * *

> Overall, the claimant asserts the majority of symptoms based on her subjective complaints. There is little objective evidence to corroborate conditions that would correlate to such extreme debilitation and far fewer instances of treatment than that expected of an individual experiencing such severe pain. When considering these circumstances with the claimant's activities of daily living and the observations during physical and mental status exams, the undersigned finds the weight of the evidence favors finding the claimant capable of work as described in the above-listed residual functional capacity assessment.

*Id.* 25-27. In addition, the ALJ gave great weight to the agency medical consultants' opinions, stating: "Their findings that [Evans] would be able to perform light work with additional manipulative, postural, and environmental accommodations are consistent with her activities of daily living, physical examination results, and even [Evans'] own admissions regarding standing and walking in her function report." *Id.* 27.

Based on those assessments and the resulting RFC, the ALJ found Evans is unable to perform any past relevant work. *Id.* It was noted Evans' past work was in skilled or semi-skilled positions but the RFC limits her to unskilled work. *Id.* 28.

Finally, at the fifth step, and considering Evans' age of 52, high school education, work experience, and residual functional capacity, ALJ Andrews found there are jobs that exist in significant numbers in the national economy that Evans can perform. *Id.* 28-29. The ALJ relied upon the testimony of the vocational expert that, hypothetically, such an individual would be able to perform the requirements of representative light, unskilled occupations such as a mail clerk, office helper and photocopy machine operator. *Id.* Thus, ALJ Andrews found Evans had not been under a disability, as defined in the Act, from August 1, 2012, through the date of the decision. *Id.* 29.

### G. Dr. Gilg's Fibromyalgia Residual Functional Capacity Questionnaire

After the decision of the ALJ was issued, Dr. Joseph Gilg completed a Fibromyalgia

Residual Functional Capacity Questionnaire dated February 18, 2015. A.R. 711-18. The questionnaire asked Dr. Gilg to attach all relevant treatment notes and medical records which had not been previously provided to the Social Security Administration. *Id.* 712. In responding to the questions, Dr. Gilg indicated Evans meets the American College of Rheumatology criteria for fibromyalgia, her prognosis was fair, and her impairments could be expected to last at least 12 months. *Id.* When asked to identify the clinical findings supporting Evans' medical impairments, Dr. Gilg answered: "Diffuse pain and tender 18 of 18 trigger points." *Id.*

Dr. Gilg identified Evans' symptoms by checking the lines for multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness and depression. *Id.* 713. He did not check the lines for muscle weakness, irritable bowel syndrome, frequent severe headaches, numbness and tingling, breathlessness, anxiety, panic attacks, carpal tunnel syndrome or chronic fatigue syndrome. *Id.* In response to identifying the location of Evans' pain, Dr. Gilg checked each line for bilateral in the lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hips, legs and knees/ankles/feet. *Id.* He did not check the line for pain in hands/fingers. *Id.*

When asked to describe the nature, frequency and severity of Evans' pain, Dr. Gilg answered: "chronic aching pain - moderate severity." *Id.* 714. Factors that precipitate pain were identified as changing weather, stress, fatigue, movements/overuse and cold. *Id.* It was also indicated Evans' pain was severe enough to interfere with attention and concentration "frequently", and Evans can tolerate "moderate" work stress. *Id.*

Turning to questions as to Evans' functional limitations in competitive work situations, Dr. Gilg indicated Evans could walk four city blocks without rest or severe pain, she could continuously sit at one time for 30 minutes before needing to get up, and she could stand at one time for 15 minutes before needing to sit down. *Id.* Dr. Gild further indicated: Evans could sit at least 6 hours in an 8-hour work day and stand/walk about 2 hours in an 8-hour work day with

normal breaks; she needs to walk every 30 minutes for a period of 2 minutes during an 8-hour work day; she does not need a job which permits shifting positions at will; she does not need to use a cane; and she would need to take unscheduled breaks during an 8-hour work day, estimated at every 2 to 4 hours for 10 to 15 minutes, during which she would need to lie down or sit. *Id.* 715.

Dr. Gilg further indicated Evans could lift and carry 10 pounds or less occasionally, 20 pounds rarely, and never 50 pounds. *Id.* 716. She could rarely twist, stoop/bend, crouch, and climb ladders and stairs. *Id.* Dr. Gilg rated Evans' ability to perform work tasks requiring handling by checking the line for "Slightly compromised, but should be able to perform tasks involving these functions at a normal pace expected by most employers." *Id.* 717. As for Evans' ability to perform work tasks requiring reaching, pulling and pushing of the arms, Dr. Gilg checked the line for "Significantly compromised. Doubtful patient can perform tasks involving these functions at a normal pace expected by most employers." *Id.* Dr. Gilg indicated Evans was likely to have good days and bad days, and estimated she would have more than four days per month in absences from work as a result of her impairments. *Id.*

At the end of the questionnaire, it was typed:

> I originally saw this patient in 2005, saw here [sic] again in May 2011, and have treated her since June 4, 2012. I have completed this form as to reflect her capabilities and limitations from June 4, 2012 forward.

*Id.* 718.

## IV. JUDICIAL REVIEW OF DECISION

### A. Standard of Review

When performing judicial review, "[t]he court's task is to determine whether the ALJ's decision 'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quoting *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008)); *see also*, *e.g.*, *Perkins v. Astrue*, 648 F.3d 892, 897

(8th Cir. 2011) (court "'will affirm the ALJ's findings if supported by substantial evidence on the record as a whole'") (quoted citations omitted)).  "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed. 2d 842 (1971) (Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))).

The "court must consider evidence that supports and detracts from the ALJ's decision," but "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quoting *Perkins*, 648 F.3d at 897).  Thus, "[e]ven if substantial evidence supports a contrary outcome, [the court] may not reverse so long as the Commissioner's decision also is supported by substantial evidence." *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004).  Stated in other words, the court

> will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the court] might have reached a different conclusion had [it] been the initial finder of fact.

*Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal quotations and citations omitted)).  The court may reverse the ALJ's decision if it is based on legal error. *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); *Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal citations omitted).

**B.      Analysis of Evans' Arguments**

In her brief before this Court, Evans makes four principal arguments: (1) the new and material evidence submitted to the Appeals Council requires a remand; (2) the ALJ's residual functional capacity assessment is not supported by substantial evidence based on the record as a whole, especially when the new evidence is considered; (3) the hypothetical questions submitted to the vocational expert are inaccurate and therefore the responding testimony does not constitute substantial evidence upon which the ALJ can rely; and (4) the ALJ erroneously evaluated Evans' credibility. Dkt. 15 at 9-15.  After considering each argument as discussed below, and upon an independent review of the record as a whole including the completed questionnaire by Dr. Gilg, this Magistrate Judge finds there are insufficient grounds for either reversal of the ALJ's decision or remand for further proceedings.  Although there is evidence supporting the claims and arguments of Evans, the ALJ's decision remains within the available zone of choice and, therefore, should not be disturbed by this Court.

### 1.   New Evidence Submitted to Appeals Council

Evans contends the Appeals Council's treatment of the new evidence submitted after the ALJ's decision "was, at best, cursory" and not properly supported. Dkt. 15 at 9.  She emphasizes that the Appeals Council merely stated, without elaboration, the "information does not provide a basis for changing the [ALJ's] decision." *Id.*  She criticizes the Appeals Council for failing to specify what weight, if any, was given to the new evidence. *Id.*  In her view, the fibromyalgia RFC questionnaire completed by Dr. Joseph Gilg is of "critical" and "extreme importance." *Id.* at 10.

The Commissioner counters that this Court does not have jurisdiction to review the Appeals Council's action, citing to *Piepgras v. Chater*, 76 F.3d 233 (8th Cir. 1996).  Dkt. 17 at 5.  As such, the Commissioner contends Evans' argument that the Appeals Council did not properly evaluate the new evidence lacks merit. *Id.*  On this point, the Commissioner is correct.

In *Piepgras*, the Eighth Circuit held it had no jurisdiction to review the Appeals Council's non-final decision to deny review where the Council considered new evidence submitted after the ALJ's decision but found it did not provide a basis for changing the decision. *Piepgras*, 76 F.3d at 238. Thus, it would be improper for this Court to review the Appeals Council's determination here to deny Evans' request for review. *See Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994) ("Once it is clear that the Appeals Council has considered newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review."). However, as agreed to by both Evans and the Commissioner, Dr. Gilg's completed questionnaire must be considered as part of the record as a whole in determining whether substantial evidence supports the ALJ's decision. Dkt. 15 at 6-7; Dkt 17 at 5.

Indeed, it is well-established that where "the Appeals Council considers new evidence but denies review, [the court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Apfel*, 501 F.3d 987, 990 (8th Cir. 2007). As further explained:

> The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the "administrative record," even though the evidence was not originally included in the ALJ's record. *See Nelson v. Sullivan,* 966 F.2d 363, 366 (8th Cir. 1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b). Here, the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion. In these circumstances, we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination.

*Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000); *see also McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (quoting *Cunningham*, 222 F.3d at 500); *Riley*, 18 F.3d at 622 (The court's "role is limited to deciding whether the [ALJ's] determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination

was made."). According to the Eighth Circuit, "[o]f necessity, that means [the court] must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing." *Riley*, 18 F.3d at 622. The Eighth Circuit considers "this to be a peculiar task for a reviewing court." *Id.*; *see also Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000) (quoting *Riley*, 18 F.3d at 622).

Accordingly, here, the fibromyalgia RFC questionnaire completed by Dr. Gilg has been considered in determining whether the ALJ's decision is supported by substantial evidence on the record as a whole. But as discussed further below, this additional evidence does not sufficiently undermine the ALJ's decision to warrant reversal or remand.

### 2. ALJ's Residual Functional Capacity Assessment

Evans contends ALJ Andrews' assessment of her residual functional capacity is not supported by substantial evidence, especially upon consideration of Dr. Gilg's responses to the fibromyalgia RFC questionnaire. Dkt. 15 at 11. She characterizes those answers as "extremely important opinions which undermine the credibility" of the assessment. *Id.* In her view, some of the limitations set forth by Dr. Gilg "preclude employment at any exertional level." *Id.*

The determination of a claimant's residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities despite his or her physical or mental limitations. *See, e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); *Roberson v. Astrue,* 481 F.3d 1020, 1023 (8th Cir. 2007); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004). In other words, "[a] claimant's RFC represents the most [she] can do despite the combined effects of all of [her] credible limitations and must be based on all credible evidence." *McCoy*, 648 F.3d at 614; *see also Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); 20 C.F.R. § 404.1545.

Residual functional capacity "is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)

(quoting *Lauer*, 245 F.3d at 704); *see also Martise*, 641 F.3d at 923. "[I]t is the responsibility of the ALJ, [however,] not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (internal citations and quotation marks omitted); 20 C.F.R. §§ 404.1545, 416.945 ("We will assess your residual functional capacity based on all the relevant evidence in your case record."). "[T]here is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Instead, the assessment "'must be supported by some medical evidence of the claimant's ability to function in the workplace.'" *Id.* (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).

"The ALJ bears the primary responsibility for determining a claimant's RFC . . . . However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Martise*, 641 F.3d at 923 (citation and internal quotation marks omitted); *see also Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) ("The claimant has the burden to establish [her] RFC."); *Moore*, 572 F.3d at 523 ("The claimant has the burden of proof to show she is disabled through step four."); *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) ("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC.").

Here, the analysis set forth by ALJ Andrews in the written decision reflects the required assessment of the evidentiary record including the subjective testimony and reports of Evans as to her mental and physical limitations, the objective medical records for treatment and diagnosis of her impairments, and the medical opinion evidence contained in the record at that time. *See* A.R. 23-27. In the opinion of this Magistrate Judge, the ALJ's assessment of Evans' RFC was properly based on the relevant evidence in the case record and met the legal and regulatory requirements.

*See, e.g., Goff*, 421 F.3d at 793; 20 C.F.R. §§ 404.1545, 416.945.

Evans contends, however, the RFC determination is "clearly suspect" in light of Dr. Gilg's opinions in the fibromyalgia RFC questionnaire. Dkt. 15 at 12. She asserts ALJ Andrews' assessment is "at odds" with her testimony and "appears to rely largely upon the opinions of unnamed paper review consultants." *Id.* In contrast, she notes Dr. Gilg treated her as a consulting specialist in 2005, again in May 2011, and on a regular basis after June 4, 2012, establishing a diagnosis of fibromyalgia and osteoarthritis of her hand. *Id.* at 10. She further notes Dr. Gilg indicated he completed the questionnaire "as to reflect her capabilities and limitations from June 4, 2012 forward." *Id.* In Evans' view, the importance of the opinions of Dr. Gilg, as a treating specialist, "cannot be overstated." *Id.*

Specifically, Evans refers to Dr. Gilg's opinions that she suffered from diffuse body pain of a severity to interfere with her attention and concentration; her ability to sit and stand was severely compromised so she should not be on her feet for more than two hours a day; she could rarely lift 20 pounds and could lift 10 pounds only on an occasional basis; she should rarely stoop or crouch; and her ability to reach, pull and push with her arms was significantly compromised. *Id.* at 10-11. Evans further emphasizes that Dr. Gilg recognized she had good days and bad days and anticipated she would miss work more than 4 days a month. *Id.* at 11. She contends none of the severe limitations set forth by Dr. Gilg are reflected in the RFC determined by ALJ Andrews which, therefore, demonstrates the ALJ's decision is not supported by substantial evidence based on the record as a whole. *Id.* Citing to the "treating source rule", Evans maintains the opinions of Dr. Gilg, as a treating physician, outweigh opinions of the state agency medical consultants who did not personally examine Evans. *Id.* at 12-13.

On the other hand, the Commissioner insists that Dr. Gilg's opinions do not undermine the ALJ's decision and, instead, those opinions are inconsistent with evidence in the record. Dkt. 17

at 6-7.  For example, the Commissioner refers to Evans' own May 2013 function report wherein she indicated no problems walking or standing. *Id.*  Further, the Commissioner refers to objective medical evidence showing Evans' gait, reflexes and coordination were consistently normal; she exhibited no effusion or tenderness and full flexion and extension of her wrists, elbows, knees and ankles; she had normal range of motion of her hips and shoulders with no tenderness on movement; and her physicians, including Dr. Gilg, recommended regular exercise. *Id.*  The Commissioner further notes in April 2013 Evans' muscle, bulk and tone were normal, and she had full motor strength in all four limbs; in the same month a cervical spine MRI indicated modest degeneration but did not conclusively show any nerve root irritation or compression; in June 2014 she reported no joint pain, swelling or musculoskeletal deformities, and her cranial nerves were intact, her sensation, strength and tone were normal, and all four extremities appeared normal with a full range of motion. *Id.* at 7.  The Commissioner argues such evidence provides support for the ALJ's residual functional capacity assessment despite the opinions of Dr. Gilg. *Id.*

The Commissioner also argues the ALJ correctly found Evans' daily activities show she could perform a range of light work. *Id.*  The Commissioner notes Evans herself indicated she drove, walked, dusted, did laundry, prepared meals, shopped in stores, exercised once a week, and attended her grandson's baseball games. *Id.* at 8-9.  This supports the ALJ's finding, in the view of the Commissioner, that such activities indicate Evans can remain on her feet throughout most of the day while performing work, particularly when the work involves only simple or repetitive tasks. *Id.* at 9.  Further, the Commissioner argues the ALJ properly considered the opinions of the state agency medical experts and did not rely exclusively on their opinions; rather the ALJ conducted an independent review of the objective medical records to assess Evans' residual functional capacity. *Id.*

This Magistrate Judge finds the Commissioner's arguments to be persuasive.  While the

Fibromyalgia RFC Questionnaire completed by Dr. Gilg is considered as new and material evidence which relates to the period on or before the date of the ALJ's decision, this Magistrate Judge does not believe the ALJ would have given Dr. Gilg's opinions the extent of weight urged by Evans. Notably, the responses provided by Dr. Gilg do not appear to be based upon a new examination of Evans or upon any medical records which were not part of the record before the ALJ, which the ALJ thoroughly examined. In light of the ALJ's finding that consistently good results of Evans' physical examinations suggest she could perform light work despite her fibromyalgia and degenerative disc disease, Dr. Gilg's opinions which were based on no new medical information or medical examinations would not have changed the ALJ's determination as to Evans' residual functional capacity.

Indeed, the ALJ found that throughout the relevant period the objective medical records show Evans' physical examinations support her ability to perform light work. A.R. 26. Further, Evans' complaints of pain and upper extremity dysfunction limiting her ability to stand, walk, lift, carry, handle and finger are undermined by her admissions in her function reports, and to her treating sources, the consistent observations of good physical abilities throughout the relevant period, and the absence of clinical correlation with the objective test results. As a result, Dr. Gilg's opinions are inconsistent with the objective evidence presented in the medical records which were before and considered by the ALJ, and provides no basis for changing the ALJ's decision.

It is well-settled that "[a] treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see also, e.g., Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017); *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). Indeed, "[o]pinions of treating physicians typically are entitled to at least substantial weight, but may be given limited weight if they are conclusory or inconsistent with the record." *Julin v. Colvin*,

826 F.3d 1082, 1088 (8th Cir. 2016). In addition, "an ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that ALJ does not find credible." *Vance*, 860 F.3d at 1120.

Here, Dr. Gilg's opinions appear to rely, at least in part, on Evans' subjective complaints which were explicitly discounted by ALJ Andrews as being inconsistent with the record. In that regard, inconsistencies between Evans' subjective complaints and evidence regarding her daily activities raise legitimate concerns about her credibility. *Id.* at 1121. Dr. Gilg's responses to the questionnaire can also be fairly characterized as conclusory and, as urged by the Commissioner, appear to be inconsistent with the record as a whole. As such, the opinions can be discounted and are not entitled to either controlling or substantial weight. In turn, the opinions of the state agency medical consultants which ALJ Andrews found to be consistent with the medical evidence could be properly relied upon in determining Evans' RFC. *Id.* at 1121.

When the record in this case is viewed as a whole, there is substantial evidence supporting the analysis and decision of ALJ Andrew, including some medical evidence supporting the RFC determination. The record does contain evidence supporting Evans' claims of disability, such as Dr. Gilg's opinions, but "'[t]he mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner does not allow this Court to reverse the decision of the ALJ." *Vance*, 860 F.3d at 1120 (quoting *Johnson v. Barnhart,* 390 F.3d 1067, 1070 (8th Cir. 2004)); *Johnson v. Colvin*, 788 F.3d 870, 873 (8th Cir. 2015) (same); *see also Reece*, 834 F.3d at 908 ("Even if substantial evidence in the record could have supported a contrary outcome, we must affirm the ALJ's decision if there is also substantial evidence to support it."). The ALJ's assessment of Evans' residual functional capacity here is supported by substantial evidence and is within the available zone of choice.

### 3. Hypothetical Question to Vocational Expert

Evans contends the ALJ submitted an inaccurate hypothetical to the vocational expert and, consequently, the vocational expert's testimony does not constitute substantial evidence supporting the ALJ's step five determination. Dkt. 15 at 13. Evans reasserts that the ALJ's residual functional capacity finding, which was incorporated into the ALJ's hypothetical, does not reflect her "real world limitations and is not supported by substantial evidence based on the record as a whole." *Id.* at 14. The Commissioner, on the other hand, maintains the ALJ's RFC determination properly accounted for the limitations supported by the record, and the hypothetical to the vocational expert accurately mirrored those limitations. Dkt. 17 at 11. The Commissioner argues that neither the limitations from Dr. Gilg's inconsistent opinions nor Evans' discredited testimony are required to be included in the RFC or hypothetical question. *Id.* Again, the Commissioner's position is persuasive.

"The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Guilliams v. Barnhart,* 393 F.3d 798, 804 (8th Cir. 2005); *see also Boyd*, 831 F.3d at 1021. "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" *Id.* (quoting *Davis v. Apfel,* 239 F.3d 962, 966 (8th Cir. 2001)); *see also Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). As further explained,

> [t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments.

*Renstrom*, 680 F.3d at 1067 (quoting *Jones*, 619 F.3d at 972 (internal quotation marks and citation omitted)). Thus, "[t]estimony from a vocational expert is substantial evidence only when the

testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Cox*, 495 F.3d at 620.

But an "'ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" *Martise*, 641 F.3d at 927 (quoted citation omitted). Stated otherwise, "the hypothetical question to the vocational expert [does] not need to incorporate the additional limitations the ALJ had properly disregarded." *Renstrom*, 680 F.3d at 1067; *see also Wildman,* 596 F.3d at 969 ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded."); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("The hypothetical question need only include those impairments and limitations found credible by the ALJ."); *Guilliams*, 393 F.3d at 804 ("Discredited complaints of pain . . . are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them."); *Hunt*, 250 F.3d at 625 ("ALJ may exclude any alleged impairments that she has properly rejected as untrue or unsubstantiated."); *Haynes v. Shalala,* 26 F.3d 812, 815 (8th Cir. 1994) ("A hypothetical question need only include those impairments that the ALJ accepts as true.").

In support of her argument on this issue, Evans merely "restates each criticism of the ALJ's RFC finding as a criticism of the ALJ's hypothetical." Dkt. 15 at 14. As set forth in the above section, however, Evans' challenges have been found insufficient to mandate changes to the RFC determined by ALJ Andrews. Instead, the ALJ's overall assessment of the objective medical records and subjective statements of Evans was found to be proper. The same analysis applies here, and in the opinion of this Magistrate Judge, the ALJ's hypothetical question adequately captured the concrete consequences of Evans' impairments based upon substantial evidence in the record as a whole, and even upon consideration of Dr. Gilg's RFC opinions.

### 4. Assessment of Evans' Subjective Complaints

For her final argument, Evans contends the ALJ committed reversible error in evaluating her credibility. Dkt. 15 at 14. She criticizes the ALJ for attacking her "credibility without mentioning her long and productive work history which should have weighed in her favor." *Id.* at 14-15. Evans further contests the ALJ's suggestion that many of her impairments were long standing and therefore she could continue to work with those impairments into the future. *Id.* at 15. She maintains this conclusion is not supported by substantial evidence, and ignores the steady progression of her impairments and limitations. *Id.* She notes her inability to return to her prior job and emphasizes her fibromyalgia became much worse over time. *Id.*

Evans also challenges the assertion her daily activities and function reports indicate she can perform light work. *Id.* She notes that, while her activities are varied, they are only performed sporadically on good days, and she requires frequent rests. *Id.* She also refers to her testimony of having reduced strength and grip in her hands, cramping in her hands, and dropping things. *Id.* She further refers to Dr. Gilg's opinion that pain from her fibromyalgia is severe enough to interfere with her attention and concentration. *Id.* Evans admits to "some walking" but argues nothing in the record supports the ALJ's conclusion she can remain on her feet throughout most of the day while performing work. *Id.*

In response, the Commissioner contends the ALJ properly evaluated Evans' subjective complaints and provided sufficient reasons for discounting her complaints. Dkt. 17 at 12. The Commissioner emphasizes the ALJ discussed several relevant factors in his credibility analysis; for example, the ALJ noted Evans was diagnosed with fibromyalgia and cervical radiculopathy well before her alleged onset date and continued to work at levels consistent with substantial gainful activity, demonstrating that Evans' impairments were not disabling. *Id.* The Commissioner also points out the ALJ properly considered evidence that Evans might have stopped working for

reasons other than her alleged impairments. *Id.* at 13. Further, the ALJ found Evans' subjective complaints inconsistent with the objective findings, notably that Evans' physicians did not restrict her activities, but instead recommended exercise, and Evans admitted no difficulty standing or walking in her May 2013 function report. *Id.* It was also noted Evans' claims of disabling symptoms due to hand osteoarthritis and carpal tunnel syndrome were contradicted by medical records showing Evans had full flexion and extension of her wrists and elbows, was able to make a full fist, her grip strength was good, and she had no swelling or tenderness in her finger joints. *Id.* at 13-14. Further, the Commissioner asserts the ALJ properly considered Evans' daily activities as undermining her allegations of completely disabling symptoms. *Id.* at 14.

In this Magistrate Judge's opinion, the ALJ's evaluation of Evans' subjective complaints was not in error. Factors for evaluating a claimant's subjective complaints were set forth by the Eighth Circuit in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

> [T]he ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence.

*Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (internal citations and quotations omitted); *see also Wright v. Colvin*, 789 F.3d 847, 853-54 (8th Cir. 2015) (applying *Polaski* factors). "The ALJ is not required to discuss each *Polaski* factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Jones*, 619 F.3d at 975; *see also Ford*, 518 F.3d at 982 ("The ALJ had to consider these matters, but did not have to discuss each one of them in relation to [the claimant].") As further explained by the Eighth Circuit,

> [a]n ALJ may discredit any subjective allegations that cannot reasonably be expected to flow from an established, medically determinable impairment. 20 C.F.R. § 404.1529(b). Once a claimant has demonstrated the existence of an impairment that could reasonably be expected to produce the alleged symptoms, the question becomes whether the claimant's subjective allegations regarding the

> extent of her symptoms are credible. *See id.* §§ 404.1528, 404.1545(e). The ALJ
> must consider the consistency of the evidence, and consider information provided
> by the claimant, her doctors, and others with knowledge of her circumstances. *Id.*
> § 404.1529(c); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

*Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016).

"'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *see also Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) ("Assessing and resolving credibility is a matter properly within the purview of the ALJ."). Thus, courts "'defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Mabry*, 815 F.3d at 389 (quoting *Johnson v. Colvin*, 788 F.3d at 872 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006))). The ALJ is required, however, to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford,* 518 F.3d at 982 (quoting *Lewis v. Barnhart,* 353 F.3d 642, 647 (8th Cir. 2003)); *Guilliams,* 393 F.3d at 802 (same).

Here, the ALJ's credibility assessments appear to be supported by good reasons and substantial evidence. ALJ Andrews explicitly identifies the applicable factors set forth by *Polaski* and the Administration's regulations. A.R. 24-25. Then, in determining Evans' RFC, the ALJ conducts a fairly in depth analysis detailing reasons throughout for discrediting certain subjective limitations expressed by Evans. *Id.* 25-27. Notably, the written decision reflects ALJ Andrews closely considered Evans' various subjective complaints and did not totally discount them, but found her statements were not credible to the extent alleged. In doing so, the ALJ found inconsistencies between the subjective complaints of Evans and the objective medical records.

As repeatedly instructed by the Eighth Circuit, "'[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole.'" *Igo*, 839 F.3d at 731 (quoting *Pearsall*, 274 F.3d at 1218 (citing *Polaski,* 739 F.2d at 1322)); *see also Teague v. Astrue*, 638 F.3d

611, 615 (8th Cir. 2011) ("The ALJ may properly discount the claimant's testimony where it is inconsistent with the record."); *Ford*, 518 F.3d at 982 (ALJ permitted to discount claimant's complaints if inconsistent with the evidence as a whole). Here, the ALJ sufficiently detailed inconsistencies in this case after thorough consideration of the evidentiary record and, therefore, did not err in the assessment of Evans' subjective complaints. Consequently, the Court should defer to ALJ Andrew's credibility determinations in this case.

## V.  RECOMMENDATION

After a thorough examination of the Administrative Record and in accordance with the standards of review the Court must follow, this Magistrate Judge concludes that the ALJ's determination that Shirley A. Evans is not disabled under the Social Security Act complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. The completed Fibromyalgia Residual Functional Capacity Questionnaire submitted to the Appeals Council after the decision, which has been fully considered as part of the record, does not provide a sufficient basis to either reverse the decision or remand for further proceedings. Accordingly, it is recommended that the final decision denying disability insurance benefits to Ms. Evans be affirmed and judgment be entered in favor of defendant Commissioner of the Social Security Administration.

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72A, the parties shall have until August 21, 2017, to file specific, written objections to this report and recommendation.

Dated August 7, 2017.

STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE